IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

Gerod Stukes

    Plaintiff(Pro se litigant),

v.                                    CIVIL ACTION NO: _2:16cv 675_
                                      JURY TRIAL DEMANDED

Paragon,Inc.,
in it's Official Capacity as the

                                            */ Complaint*

    Defendant.

MOTION FOR JUDGMENT AND INJUNCTIVE RELIEF

**Comes now**, plaintiff, Gerod Stukes, for cause against

Defendant to assert pursuant to the Rules of this

Court, the laws of the United States, and as relied

upon plaintiff's attached sheets to the enclosed EEOC

charge of which was submitted to the EEOC on 10/19/15,

for processing to allege Title VII, ADEA, and sex

discrimination violations in retaliation as a result of

defendant's hostile work environment incubated with

harassment and intimidation causing disparate treatment

against plaintiff for choosing to rely on the union's

Collective Bargaining Agreement as presumed or lead to

believe to be a union member of SPFPA to the contrary to plaintiff's discovery to actually be a non-union member with still entitled rights yet deprived of fair representation concerning Weingarten as associated with or related to §7114(a)(1) of Federal Labor Relations Authority towards petitioning defendant during the disciplinary, and investigative state and federally regulated equal employment opportunity process, and the union's grievance procedures of which has adversely impacted formulations on subsequent post-employment processes. Now the enclosed copy as attached in support of the EEOC charge used to construct this Complaint is as follows:

### I.  INTRODUCTION  (EEOC CHARGE) (¶¶ 1-7)

1).  As implemented and sustained *"under color of law"* before witnesses and without regard for compliance or authorization of federal and state employment practices and/or grievance procedures in relations included but not limited to violations of Title VII, and Civil Rights Act of 1964, Title 42 U.S.C. §§ 1986, 1983, and

1981, the First, Fifth, and Fourteenth Amendments; Captain Michael Bollenbacher, PSO Baldeo, Stephanie Knight(the Project Manager), Sidney Harrell(the Training Instructor), and Sergeant Kasai Young(a supervisor) all on behalf of and condoned by Paragon Systems, Inc. thru Janna Chirdron with Employee Relations of Paragon did recklessly and deliberately, or did intentionally, knowingly, and willfully engage in discrimination with an *invidious motive* based on Gerod Stukes' race, age, and sex by inducing and/or imposing to subject Stukes towards a continuance to promulgate *harassment*, and *intimidation* that had established a sustained campaign for an egregious and unreasonable *hostile work environment* reinforced with retaliation as a result of Stukes seeking to engage in federally protected activity during his employment and to apply, preserve, and protect his *labor rights* due to being an employee of Paragon, and because of the reprehensible investigative nature or condition for which the Employer applied the disciplinary or

grievance procedure with usurpation for denial of Stukes' entitled rights concerning his employment benefits, pay, contractual union representation, proper grievance procedures prior to termination, and proper termination, but instead; Employer and its' agents/employees to the contrary had failed to maintain the integrity of **Paragon's Equal Employment Opportunity Policy,** that included the disciplinary employment process, stemming from calculation of commencement for consummation of their sinister self-serving plot that was cultivated and laced with tortious, and egregious execution for retaliatory usurpation of Stukes rights with respect for the laws to reprimand and suspend Stukes without pay for over 50 days, to only result in wrongful termination of Stukes employment from June 3, 2015, because of Stukes' refusal to sign(at the Virginia Beach Pembroke Office) on June 4, 2015, due to a *two to three minute* discrepancy over Employer asserting a patently false reprimand for being late by Captain Bollenbacher's watch as compared to the clock,

of which marinated towards escalation on June 11, 2015(with creation by Employer for enforcement at the Pembroke office to administer another unsigned patently false reprimand against Stukes for falsifying time records), that prompted Stukes to again to feel depressed, and ill wanting to diffuse the issue, and leave as a result of repeated denial to allow application of a fair disciplinary process, and union rights, but instead except Baldeo, Employer's management stated above with appalling irrationality chose to engage in a four on one altercation, by forcefully, physically, and recklessly touching Stukes to take his Utility belt and Fire arm risking both Complainant and Respondents life, liberty and property that later resulted in suspension and termination by stating Stukes was insubordinate to the demands of Employer despite Stukes desperation to protect himself and his job by recording with cell phone the situation of June 11, 2015.

2).   During the incident around June 11, 2015,

Complainant was ordered to arrive at the office as proofed by the cell phone recorded altercation at the Virginia Beach, Virginia Pembroke office.   Days later the Project Manager, Ms. Knight said, "I'm not firing you" only just to end up fired away of which appears as retaliatory for filing an Assault Charge against Captain Michael Bollenbacher, Stephanie Knight(the Project Manager), Sidney Harrell(the Training Instructor), and Sergeant Kasai Young(a supervisor) concerning the intentionally threatening and forceful confrontation that restricted Stukes movement in order to satisfy an obsession with great risk to remove Stukes utility belt with baton, O.C. spray, and gun, while Stukes was attempting with futility to leave the office to defuse the hostile altercation, but instead Stukes access was blocked, and was physically detained by respondents until they had finished by forcefully and foolishly removing the gun from Stukes' person despite having the power to implement established policy of Paragon's exit procedure to turn in uniforms

and items of which was ultimately executed away. Once respondents had taken the gun, Stukes fearfully gave up the utility belt feeling uncertain and fearful of what is to happen next.

3). Ms. Knight during the office altercation yelling roughly, and displayed intimidating body language and gestures that included hand and finger pointing and waving close up in Stukes' face repeatedly brushing against Stukes as if he was a child, a cat or dog guilty of some vile act, or as if Stukes had cheated on her and Paragon for falsifying time records, and was caught red handed in the act, and for that she wanted a divorce on behalf of Paragon triggering a period of separation that was supported with false reprimands, over 50 days of suspension and then wrongful termination of the employment relationship without any regards for Stukes rights to employment and contractual union rights similar to how 200 union people striking were treated in Texas by Paragon management as stated by the news articles of Sun Times Network(Dallas

Morning News), and 5NBCDFW.com(FCC News) . Stukes is owed back pay of approximately $1500.00 plus interests.

4). After the altercation, Complainant called 911 and waited 35 minutes to report an assault and battery charge to a police officer of which Stukes was told to go to the magistrate during June 11, 2015. Stukes reported the incident to the magistrate's office concerning respondents by submitting sworn affidavits. The hearing was conducted on August 31, 2015, of which was dismissed leaving Stukes impoverished to preserve his appeal as a result of Paragon's usurpation.

5). During the suspension Janna Chirdron on July 22, 2015, and July 29, 2015, respectively had emailed Stukes for information concerning the incident of June 11, 2015. Stukes responded to the July 31, 2015, demand from Chirdron by phone to acquire a time to discuss suspension matter and reprimands. Janna Chirdron wanted a statement regarding the incidents,

Stukes refused by explaining he is pending a criminal trial on his assault and battery charges and would be available later for comment. Ms. Chirdron said she would forward Stukes decision to refuse over to the legal team.

6). Also while Complainant was suspended Stukes informed his union representative Donald Dunbar, and Arthur Dunston the union president who submitted a grievance to Paragon on Stukes behalf. The union was given the wrong reasons why Stukes was suspended. Paragon sighted the incident on June 11, 2015, for the suspension, but Stukes was called into the office for allegedly being late three minutes, falsifying government documents, and insubordination.

7). On July 28, 2015, VEC deemed Stukes as qualified to receive unemployment benefits effective June 14, 2015, because the Employer failed to submit additional evidence of separation information. During the Virginia Employment Commission appeals telephonic

hearing, respondents accompanied with counsel lied and provided conflicting testimony under Oath by stating Stukes failed to turn in his utility belt and weapons of which resulted in a reversal rendered 09/21/15, for Paragon leaving Stukes impoverished with the decision to pursue two appeals.

8).    As a result of those then pending appeals processes other actions and/or appeals were and are still being sought for resolve.

9).    **§ 7114(a)(1)of FLRA** clearly states the following:

"A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership."

10).   As related to the National Labor Relations Board plaintiff had access to:

## A. RIGHT TO FAIR REPRESENTATION

"You have a right to be represented by your union fairly, in good faith, and without discrimination. Your union has the duty to represent all employees – whether members of the union or not-fairly, in good faith, and without discrimination. This duty applies to virtually every action that a union may take in dealing with an employer as your representative, including collective bargaining, handling grievances, and operating exclusive hiring halls. For example, a union which represents you cannot refuse to process a grievance because you have criticized union officials or because you are not a member of the union. But the duty does not ordinarily apply to rights a worker can enforce independently – such as filing a workers' compensation claim – or to internal union affairs – such as the union's right to discipline members for violating its own rules."

## B.   What about Right to Work states?

Twenty-four(24) states have banned union-security agreements by passing so-called "right to work" laws. In these states, it is up to each employee at a workplace to decide whether or not to join the union and pay dues, even though all workers are protected by the collective bargaining agreement negotiated by the union. These states include Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas,

Louisiana, Mississippi, Nebraska, Nevada, North Carolina, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin, and Wyoming.

11).  On August 25, 2016, the EEOC after processing plaintiff's EEOC charge, issued a Notice of Right to Sue for which plaintiff avers the following:

## II.   As it appears, Paragon's intent to apply the At-Will-Employment-Policy outweighed plaintiff's entitled rights as associated with SPFPA

12).  Paragon's actions to discipline plaintiff of whom had a fifteen(15) year relationship as related to SPFPA was ignored, and disregarded while choosing rather to sadistically draw from the same initial issue that stemmed from tardiness of which lead to suspension and ultimately termination for which as determined without application of plaintiff's rights to equitable or fair representation as concerning Weingarten as associated with or related to §7114(a)(1) of Federal Labor Relations Authority towards petitioning defendant

during the disciplinary, and investigative state and federally regulated equal employment opportunity process, and the union's grievance procedures of which has adversely impacted outcomes on subsequent family life and post-employment judicial processes.

13). It appears Paragon with usurpation has erred by failing to apply plaintiff's Weingarten rights during and within the deprived disciplinary and investigative processes but instead applied with threat, duress, and coercion the Employer's At-Will-Employment-Policy against plaintiff thus, foreclosing plaintiff's entitled rights for unemployment benefits as a wrongfully terminated SPFPA non-union member and employee status while denying said rights thrice.

14). It appears Paragon has erred by failing to remain compliant to plaintiff's rights of access to the Collective Bargaining Agreement to petition and entitlement to a fair process during and within the employer's biased disciplinary, investigative, and VEC

appeals processes.  Paragon failed to admit that it's corporate office and local office waited 42 days later while plaintiff was on *suspension* to take plaintiff's first statement towards an investigation concerning the issues of dispute that all resulted in a bogus discharge on 07/31/15, as affirmed by Janna Chirdon, a Specialist with Paragon's Employee Relations.

15).  It also appears Paragon, Inc., has erred by conducting a disciplinary and investigative employment process by only applying the At-Will-Employment-Policy in contractual breach of the Collective Bargaining Agreement and in violation of plaintiff's First, Fifth, and Fourteenth Amendment rights to petition, Stukes' entitled rights to a fair disciplinary, VEC and NLRB appeals processes, included but not limited thereto.

16).  Paragon had consented to the fact that it was okay for Paragon to engage in applying hostile barbaric excessive physically confrontational force against Stukes to take a firing arm from the duty belt Stukes

was wearing within the business office at the risk of injury and/or death to anyone when the employer has a more civil and safer "exit policy" in place to administer to turn in all equipment of employer's property prior to receiving the last check and/or other benefits.  It is on record Paragon didn't deny or object to plaintiff's tape recorded event of which was made a part of the record for VEC and NLRB(still in progress) adjudication that can't be overlooked or not considered.

17).  In other words; it appears Paragon's management has conducted their shoddy disciplinary and rogue investigative procedures like hoodlums, thugs, and/or tramps; while engaging in an usurpation of power in addition to bringing that same *self-serving conduct* before the Virginia Employment Commission, as a result plaintiff has become further prejudiced within the VEC and NLRB appeals processes.

18).  It appears that Paragon has consented within

itself(through its' subordinates on behalf of and as condoned by the Defendant) to the fact that it was/is okay for Paragon to engage in failing to rectify the issue of providing an official time clock rather than just ignore the CCTV clock issue at the job site to remain unresolved concerning to the employer's *interests* of it being inadequate.  Besides plaintiff can't see Captain Bollenbach's watch from where ever else the captain may be when arriving at the job site at the Norfolk Social Security building in order to go by official Paragon's time, neither was prior notice given of the same before the first written warning.

19).  Plaintiff further objects to Paragon, Inc.'s, finding of facts and formulation for opinion of which all are drawn from the same tree of *Fraud or falsehood* because of the statements asserted by plaintiff above consequently; will prove that no mitigating facts or circumstances has truly or properly been demonstrated to explain or justify insubordination, suspension, discharge(**separation from the SPFPA relationship**), and

disqualification for benefits. Plaintiff hereby relies on the records accumulated and this current judicial process to serve as grounds for plaintiff's defenses that are included but not limited thereto against Defendant.

20). On June 4, 2015, the Captain while denying plaintiff's Weingarten rights for union representation as requested by plaintiff, had summoned plaintiff to the office to issue a written warning for being late, when the CBA between Paragon, Inc., and SPFPA clearly states that, "With respect to the [presumed] first absence or late reporting to work within any consecutive 12-month period, counseling shall be given."

21). On June 11, 2015, the captain and the program manager while again denying plaintiff's Weingarten rights for union representation as requested by plaintiff, summoned plaintiff to the office to issue a second written warning for insubordination, because as

they purport claimant did not put the correct time on the time sheet as instructed, when the CBA between Paragon, Inc., and SPFPA clearly provides with respect to the [presumed] second to work within any consecutive 12-month period, for application of plaintiff's rights to:

a). **Sections 12.1 (Just Causes)** in which states:

"No employee shall be discharged or disciplined without just cause, and discharge and discipline matters shall be subject to the grievance and arbitration procedures contained in this Agreement.  However; the Arbitrator shall not have the authority to reduce a discharge or otherwise modify the discipline imposed by the Company for a proven violation," and

b). **Section 13.1(Grievances)** of the CBA states that,

"A grievance shall mean a disagreement or dispute raised by the union or the employee which arises during the term of this Agreement concerning the application, meaning, or interpretation of an express provision of this Agreement or the employment relationship between the Company and employee, including but limited to claims of unlawful employment discrimination as set forth in Article 5 of this Agreement."

**22). Except the acknowledgement of June 22, 2015, verified with the enclosed document, at no other time was either Section 12.1 nor 13.1 ever considered by**

**Paragon as contributed with the denial of opportunity to provide timely evidence to the Commission towards formulation of its' fact-finding for decision making.**

### IV.   Defendant admits it took by force the loaded fire arm from plaintiff during the <u>disciplinary investigation</u>.

23). Make no mistake about this corporate action that was executed by and also admitted directly without contest from the defendant's counsel and from the Defendant should be perceived or opinionated from a competent Court having jurisdiction as a hostile, adverse, arbitrary employment procedure of which did occur prior to suspension, and/or termination because:

24). As further proofed in a decision made by the Virginia Employment Commission, it was determined that plaintiff was improperly or wrongfully suspended as a result of the actions executed by the Defendant.

25). As it appears, the defendant had options and the time to avoid an unlawful employment practice knowing that the defendant could be held responsible for its

actions while being in control of a self-serving engineered corporately crafted state and federally unregulated employment importunity process, but rather chose to engage in full throttle in an exercise of usurpation under color of law against plaintiff.

26). It appears the Defendant deliberately had recklessly, and irrationally made an impulsive decision to bypass plaintiff's due process and equal protection rights to have fair representation pursuant to plaintiff's rights concerning §7114(a)(1) of the Federal Labor Relations Authority as related to Weingarten having association with and protected by SPFPA's non-union member duties.

27). Just like as it appears the defendant made a rather foolish decision to pretend to call 911 and then engage in a four on one forceful confrontation to take the duty belt that included a loaded gun during a disciplinary and investigative employment process of which didn't give rise and/or merit for such a

provocation as stemmed from Defendant intending to as it appears to vehemently enforce plaintiff as plaintiff refused to sign a written warning deriving from being two to three minutes late according to Captain Bollenbauch's watch as compared to the time clock posted on cite by the Social Security Administration, then considered or deemed as being insubordinate because plaintiff just wouldn't agree to sign defendant's second patently false written warning that caused plaintiff to again exercise rights of Weingarten that was again denied by defendant without incident from plaintiff seeking permission to peacefully leave to diffuse the disagreement, and then as it appears Ms. Knight(project manager) on behalf of the defendant in explosive fit of rage sought to up-the-anti as verified by the defendant's actions to indulge in more hostility to reinforce defendant's arbitrary and/or capricious demand for the duty belt as recorded by plaintiff.

28). Captain Bollenbach(white) appears to be about 5'5",120lbs., with average physique; Sidney  Harrell

(white) appears to be about 5'10", 220lbs., with large semi-obese physique; Kasui Young(black) appears to be about 5'10", 220lbs., with large fairly built physique; and Stephanie Knight(white) 5'8", 145lbs., with petit built and loud mouth.  It was only one way in and out of Captain Bollenbach's as it appears 10" by 12" office having standard lighting office around 1pm on July 11, 2015, where confrontation with plaintiff escalated on behalf of defendant to engage in dangerously risky and brutally forceful activity to remove the duty belt.

29).  As it appears this unscrupulous brazen use of excessive force by the subordinates on behalf of and as condoned by the defendant during as presumed the state and federally regulated equal opportunity employment process included the subordinates' deliberate placing of hands on the plaintiff to deter and restrict plaintiff's futile evasive movements to access departure for avoidance of confrontation of being pounced on by subordinates in order for defendant to retrieve the duty belt was irrationally arbitrary.

30).   Therefore; it appears the employment action executed by the defendant was extremely dangerous, risky and unwarranted leaving plaintiff victimized, hurt, and disenfranchised along with an unlawful fifty-one(51) day suspension that ended by wrongful termination without due process and equal protection of the law beginning with 42 U.S.C. § 2000e as amended (pertaining to Title VII general provisions) concerning Employer practices such as:

"(a) Employer practices.

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

31).   Also within the NLRA states as follows:

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment[,] to encourage or discourage membership in any labor organization." (An employer that violates Section 8(a)(3) also derivatively violates Section 8(a)(1)).   For example, you may not:

"[i]   Discharge, constructively discharge, suspend, lock out, lay off, fail to recall from layoff, demote, discipline, or take any other adverse action against employees because they support the union or engage in union activities.

[ii]   Engage in discriminatory conduct that is inherently destructive of employee rights under the Act, unless [Paragon, Inc.] can show a legitimate and substantial business justification for [it's] conduct that outweighs the invasion of employee rights."

32).   As previously mentioned, Plaintiff's suspension and termination derives from the defendant's denial of plaintiff's rights to fair representation along with plaintiff's assertion of falsifying time records against the demand of defendant for plaintiff to write in 8:20am rather than 8:16am put plaintiff in a rather precarious legal situation on the spot despite not receiving prior notice from the union nor being afforded opportunity to consort with the union on this

matter concerning the issue of the Social Security Administration time clock(CCTV) prior to adhering to Defendant while the clock issue remains unresolved.

33). In other words, plaintiff was caught between deciding to be insubordinate as the defendant purports or as plaintiff believed becoming a co-conspirator to falsify time sheets as reflected by the SSA's time clock with respect to the labor laws, Defendant's policies, and the union's bylaws.

34). Defendant's whites and one black supervisors were not punished for their insubordination as easily proved by defendant's **"Rules For Personal Conduct"** numbers 1, 6, and 9 concerning **"Major Rule Offenses"** as obviously compared to plaintiff's suspension and termination of which is less justifiable as explained above. Plaintiff as compared to whites similarly-situated and as condoned by the defendant, Ms. Knight and Ms. Chirdon (two white females), and the other supervisors (two other whites and one black men) of which [are also

non-union members] were able to keep their job without discipline after engaging in unlawful employment practices initiated on behalf of the defendant despite upper management's knowledge of the existence of the At-Will-Employment-Policy as related to the company policy with respect to the defendant.

35). It appears defendant's motive as drawn from the aforementioned circumstantial evidences that derived from as defendant purports being four minutes late resulting in by defendant's standards for insubordination, suspension, and termination are pretextual as applied by defendant's policymakers.

36). Concerning the union grievance process Paragon was supplied two statements about what had happened to Stukes on June 11, 2015, in the Paragon's office located in the Pembroke 2 Office Building in Virginia Beach, Va. One statement was submitted to the Local 452 Union representative(Mr. Dunbar) during the Grievance process dealing with Stukes' 51 day

suspension from the GSA Contract *well before Stukes'*
*conversation with Jana Chirdon on July 31, 2015, in*
*which was given as a disciplinary interview that lead*
*to plaintiff's termination.*  The other statement was
given to Paragon from a written Criminal Warrant that
was served on Ms. Knight, Capt. Bollenbacher,
Instructor Sydney Harrell, and Sgt. Kasui Young.   Ms.
Chirdon"s alleged claims that Stukes failed to supply a
written statement is therefore again patently false.

37).  Since the defendant was exonerated in the
criminal trial, it would have been advantageous to
accept plaintiff's criminal complaint while relying on
the decision from the judge on August 31, 2015, leaving
lesser reasons to ask for another statement.

38).  The three denials of plaintiff's right to fair
representation, the patently false reprimands, the
enraged impulsive altercation, the wrongful suspension,
the bogus request by defendant to receive another
statement, the loss of employment, and plaintiff's cell

phone recording of the event is motive, enough to prosecute this case criminally and civilly.

## V.   RELIEF SOUGHT

A.   Plaintiff requests the court to grant Injunctive Relief as follows:

B.   The Defendant through its agents, supervisors, employees, etc. be enjoined from maintaining current unlawful employment practices against Plaintiff in violation of Title VII of Civil Rights Act of 1964 as conflicting with Title VII and NLRA.

C.   Issue an injunction prohibiting denial of equal employment opportunity to Plaintiff and comply with Title VII, and laws of the United States. See Exhibit A (which includes Right to Sue Letter).

D.   In accord with the foregoing, plaintiff, Gerod Stukes claims damages against defendants as follows:

| | |
|---|---|
| Compensatory (back pay) | $51,200 Dollars |
| travel expenses | $600 Dollars |
| mental anguish | $4.5 Million Dollars |
| expected loss | $70,000 Dollars |

of lifetime investment          $30,000 Dollars

of his property                 $48,200 Dollars

and loss of his stability       $150,000 Dollars

protection, care                $150,000 Dollars

and residence

Punitive damages:                       $11.75 Million Dollars

Attorney fees,42 U.S.C. § 1988(b):$8.25 Million Dollars

**Total damages:**                           **$25 Million Dollars**


Wherefore; plaintiff moves this Court for judgment

against Defendant for back pay, job restored, and

damages concerning issues asserted above in addition

to plaintiff's costs expended in this action(pursuant

to law).  Plaintiff request competent legal counsel be

timely appointed in the interest of justice for fair

representation of a proper case to the Court.


Respectfully Submitted,

_Gerod Stukes_
Gerod Stukes, pro se litigant      757-537-4100
1904 Stillwood Lane
Virginia Beach, Virginia 23456